UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 05-150 (HHK) |
| v. | Judge Henry H. Kennedy, Jr. |
| STEVEN BERRY,<br>LAMESHA OWENS,<br>DOMINIQUE CHAPPELLE,<br>         Defendants. | |

**GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS'
MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

The United States of America, by and through its attorney, the United States Attorney for the

District of Columbia, hereby submits this opposition to the defendants' Motions to Suppress Physical

Evidence and Statements. The government relies upon the points and authorities set out in this

memorandum and at any hearing on this matter.

**I.      FACTS**

A Grand Jury has returned a six-count indictment charging the defendants with, among other

things, Possession with Intent to Distribute Cocaine Base, based on the recovery of approximately

229 grams of crack cocaine during the execution of a search warrant conducted on March 22, 2005,

at 232 W Street, N.W., Apartment 33, Washington, D.C. Mr. Berry is charged with an additional

count of Possession with Intent to Distribute Cocaine Base, arising out of a search of his BMW on

March 30, 2005, which resulted in the recovery of, among other things, an additional quantity of

crack cocaine weighing approximately 48 grams.

The government expects the evidence at trial to show that on March 22, 2005, at

approximately 8:25 a.m., members of the Metropolitan Police Department's Third District Focus

Mission Team executed a search warrant on this apartment, based on monitored drug sales out of

that apartment in the previous days.   When the officers arrived at the apartment, they knocked on the door and announced their presence.  The officers waited approximately 10 seconds, and then, hearing movement inside but no acknowledgment of their presence, forced entry into the apartment, which was leased in the name of Dominique Chappelle.  Once inside, the officers found defendant Steven Berry in the hallway outside the kitchen, rapidly crossing the threshold into the kitchen, defendant Dominique Chappelle in one bedroom, and defendant Lamesha Owens, along with her infant, in the other bedroom.  Upon seeing the officers, and before they said anything to him, defendant Berry stated that he didn't live there, and that he was just there to visit the girl Dominique.

During the execution of the search warrant, the agents located in the kitchen a blue plastic shopping bag on a chair, containing the following items of contraband: (a) nine plastic bags, each knotted at the top and containing a large chunk of white rocklike substance, totaling approximately 29 grams each, which later field-tested positive for the presence of cocaine, (b) a plastic sandwich bag containing 84 smaller ziplocks of white rocklike substance, weighing approximately 15 grams in total, which also field-tested positive for the presence of cocaine, (c) 39 ziplock bags of marijuana, (d) a .9mm fully-loaded magazine, (e) 7 $100 bills of counterfeit U.S. currency wrapped around the .9mm magazine, and (f) a large clear ziplock bag containing numerous small empty ziplock baggies.  In addition, from a kitchen cabinet, officers recovered an electronic scale and numerous additional empty ziplock baggies, and from the living room a cardboard box containing loose green weed, which later field-tested positive for the presence of THC, the active ingredient in marijuana.  From the purse of Lamesha Owens was recovered 4 small ziplock bags of green weed, which also later field-tested positive for THC.  And from Dominique Chappelle's bedroom, 10 new crack pipes were recovered.  In addition, mail in the name of Ms. Chappelle and Ms. Owens with

the address of the apartment were located in their respective bedrooms. Mail in the name of Mr.

Berry, with a different address, was also found in Ms. Chappelle's bedroom.

After defendant Berry was advised of his Constitutional right to silence, and while he was

being detained by police on the scene, Mr. Berry repeatedly shouted in a loud voice – so loud that

the officers who had detained the women in the back bedrooms could hear -- "don't nobody say

nothing until we get a lawyer!"

The defendants were taken to the Third District Police station, processed, and transported to

the cellblock in the Superior Court of the District of Columbia, where they were held pending

transfer to District Court for presentment. For reasons which are still unknown to the government,

there was an error in the processing of the co-defendants, resulting in the transfer of Ms. Owens and

Ms. Chappelle to District Court for presentment on a complaint charging each with Possession with

Intent to Distribute Cocaine Base, and the erroneous release of Mr. Berry back into the community

directly from the Superior Court cellblock, never having been presented on the criminal complaint.

Once this release error was discovered by the government, a separate arrest warrant was

prepared for Mr. Berry, who remained at large in the community for eight days. Mr. Berry was

ultimately arrested on this warrant on March 30, 2005, at the home of his fiancee, and transported

to the police station, and ultimately to the District Court cellblock, for presentment on the original

criminal complaint, charging him with Possession with Intent to Distribute Cocaine Base. That same

day, after defendant Berry's arrest, members of the FBI/MPD Safe Streets Task Force located the

defendant's BMW,[1] bearing Maryland tags MKT025, in the 200 block of W Street, N.W. The

---

[1]    While this car is registered in the name of "Ricardo Punch," defendant Berry had keys to that car in his pocket on the day of his March 30, 2005, arrest. In addition, recovered from Mr. Berry was a Maryland driver's license in the name of Ricardo Punch, but bearing Mr. Berry's photo.

officers called the Canine Unit and requested that a trained narcotics-detection dog come to the scene, to conduct an investigation into whether there was contraband in defendant Berry's BMW. Shortly thereafter, a certified drug detection dog circled defendant Berry's car. After doing so, the dog indicated the presence of narcotics at the trunk of the car. At that point officers called for a crane to transport the car to the police station so that officers could obtain an arrest warrant and search the car. However, because the canine also alerted on a Nissan Maxima parked nearby, officers towed the Maxima to the station via the crane, and after sealing the trunk of the BMW with crime tape, used the keys recovered from Mr. Berry to drive the BMW to the police station. Officers then applied for a search warrant for the BMW on March 31, 2005, executed it that day, and recovered from the trunk approximately 48 grams of white rocklike substance which field-tested positive for the presence of cocaine, packaged similarly to the crack cocaine recovered from the apartment a week prior, along with an electronic scale.[2]

## II.    ARGUMENT

Defendants[3] argue that the physical evidence and Berry's statements must be suppressed for the following reasons: (1) the officers violated the knock-and-announce statute, (2) the search of the car was based on the fruit of the illegal search of the apartment, and (3) defendant Berry's statements

---

Finally, according to the Pretrial Services Report prepared in connection with the March 23, 2005, arrest, defendant Berry also uses the alias "Ricardo Punch."

[2]    While investigators believe it is wholly unrelated to defendant Berry, in the interest of completeness, the government notes that approximately 58 baggies of marijuana were recovered from the Maxima, along with an electronic scale and a clip for a .9mm handgun.

[3]    Because defendant Owens adopted defendant Berry's motion to suppress evidence, and defendant Chappelle filed a general motion to suppress, for ease of reference, the government treats all the arguments as advanced by each of the defendants.

were elicited in violation of his *Miranda* rights. All of defendants' arguments fail, and their motion to suppress must be denied.

### A.    The Officers Complied with the 18 U.S.C. § 3109

Defendants argue that the evidence in this case should be suppressed because the officers failed to comply with the knock and announce requirement established by the Supreme Court in Wilson v. Arkansas, 514 U.S. 927 (1995), and 18 U.S.C. § 3109. As an initial matter, defendant Berry does not have standing to make this argument, as by his own words, he did not live in that apartment, but rather was just visiting, and further, he was not on the lease. However, even assuming *arguendo* that he did have standing, this argument nonetheless fails.

Contrary to defendants' allegations that the officers did not knock and announce their presence, and as all the paperwork in the case makes clear, the agents acted reasonably in knocking and announcing their presence, then forcibly entering the residence after waiting a reasonable period of time. It is well settled that an officer may forcibly enter a house in order to execute a search warrant "if, after notice of his authority and purpose, he is refused admittance." Spriggs v. United States, 996 F.2d 320, 322 (D.C. Cir. 1993) (quoting, United States v. Bonner, 874 F.2d 822, 924 (D.C. Cir. 1989)), cert. denied, 510 U.S. 938 (1993). In this case, the agents approached the premises, knocked, announced their presence, stated that they had a search warrant, and demanded entry. The officers waited at least 10 seconds for any response to their announcement, and when they heard nothing but suspicious noises, they forced entry. Addressing this very circumstance, the Court in Bonner held that based on a delay of 11 or 12 seconds, coupled with suspicious noises coming from inside the residence, officers were justified in their conclusion that they were being refused admittance. See also Spriggs, 996 F.2d at 323 ("officers could reasonably infer refusal after a delay

of 15 seconds"). Because the officers complied with the knock-and-announce requirements of 18 U.S.C. § 3109, there is no basis to suppress the physical evidence or defendant Berry's statements in this case.

### B.    Defendant Berry's Statements were Voluntarily Made.

Defendant asserts that his statements were involuntary; thus, the government must establish by a preponderance of the evidence that the statements were voluntary. See Lego v. Twomey, 404 U.S. 477, 489 (1972). To determine whether a statement was voluntarily made, this Court must examine the totality of the circumstances to determine whether the defendant's "will has been overborne and [her] capacity for self-determination critically impaired." See Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); Colorado v. Connelly, 479 U.S. 157, 167 (1986). "Without a showing of coercive police activity . . . there is not a basis for concluding that [a defendant's] confession was involuntary . . . ." Martin v. United States, 567 A.2d 896, 908 (D.C. 1989).

Here, the totality of circumstances make clear that defendant Berry's statement that he was not resident of the apartment, but rather was "just visiting," and his repeated command: "don't nobody say nothing until we get a lawyer!" were voluntarily made, and that his will was not overborne. The defendant identifies no coercive police activity, and the circumstances of defendant's statements do not suggest that it was the product of coercive police activity, or was in any other way involuntary. Defendant Berry, upon taking notice of the entering police officers, simply offered up a defense, i.e., that whatever the police were there for, he was in the clear, as he didn't live there. Further, in the subsequent statements, the defendant shouted to his would-be codefendants what can only be construed as a warning to keep their mouths shut. There is nothing in these circumstances

that would suggest that these were anything more than self-serving statements by the defendant, voluntarily made.

In cases with much starker circumstances than those in this case, the courts have found statements to be voluntary.  See, e.g., Bliss v. United States, 445 A.2d 625, 631-32 (D.C. 1982) (defendant was in pain from gunshot wound, had little food or sleep, but it was a flesh wound, there was little blood, and he was able to answer questions), cert. denied, 459 U.S. 1117 (1983); Harris v. Dugger, 874 F.2d 756, 759-62 (11th Cir.) (confession voluntary even though defendant in forearm cast and handcuffed during six-hour interrogation), cert. denied, 493 U.S. 1011 (1989); United States v. Leon Guerrero, 847 F.2d 1363 (9th Cir. 1988) (promises that cooperation would be communicated to prosecutors insufficient to overcome will); United States v. Yunis, 273 U.S. App. D.C. 290, 298, 859 F.2d 953, 961 (1988) (defendant's seasickness, his uncomfortably hot room, and his unfamiliarity with American legal culture not a legally adequate basis for concluding that confession was involuntary); United States v. Pelton, 835 F.2d 1067 (4th Cir. 1987) (FBI agent's assertion that agent would launch full-scale investigation if defendant did not cooperate not sufficient to render statements involuntary), cert. denied, 486 U.S. 1010 (1988).

C.    **Defendant's Statements Did Not Violate _Miranda_.**

Defendant argues that his statements were made in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).  The strictures of Miranda apply to statements which are the product of custodial interrogation.  See Calaway v. United States, 408 A.2d 1220, 1224 (D.C. 1979).  For purposes of Miranda, a suspect is in custody only if the there is "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (internal citations and quotations omitted).  A suspect in such a situation

must be informed of his right to refuse to answer any statements; the failure to do so will lead to the suppression of any statements that suspect makes. <u>Dickerson v. United States</u>, 530 U.S. 428 (2000).

In this case, there is no indication that the defendant was in anything resembling custody when he made the first statement: "I don't live here, just visiting a girl." Indeed, the officers had barely crossed the threshold of the apartment, and had yet to recover a single item of contraband from that apartment, making an assertion of custody untenable. Further, with respect to defendant Berry's command to his codefendants that they better keep quiet until they get a lawyer, he actually had been advised of his <u>Miranda</u> warnings at that time, but chose to make this statement anyway, in a completely spontaneous manner. Indeed, an examination of the content of the statement makes clear that this repeated statement couldn't have been made in response to any sort of police questioning.

**D.    The search of defendant Berry's car was proper.**

Defendant Berry claims that the search of his BMW was improper because officers seized the car and drove it to the police garage prior to obtaining a search warrant. Because at the time they impounded the car, officers had probable cause to search it, this argument, too, fails.

In light of the canine's training and certification, his bark established probable cause to believe that their were narcotics in defendant Berry's car. Courts have accepted dog sniff evidence for over one hundred years. <u>See</u>, <u>e.g.</u>, <u>Blair</u> v. <u>Commonwealth</u>, 204 S.W. 67 (Ky. Ct. App. 1918) (collecting cases). Our Court of Appeals has specifically held that the actions of a trained dog provides probable cause for a search. <u>United States</u> v. <u>Tartaglia</u>, 864 F.2d 837, 840 & 842 (D.C. 1989) (probable cause to search train roomette when dog "scratched" at door and whined); <u>United</u>

States v. Fulero, 498 F.2d 748, 749 (D.C. Cir. 1974) (dog's indication of narcotics established probable cause to search a foot locker).

Other courts as well have repeatedly stated that a trained dog's reaction to the scent of narcotics provides probable cause to search an automobile. See, e.g., United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) ("When dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed."); United States v. Seals, 987 F.2d 1102, 1106-07 (5th Cir. 1993) (dog alert gives probable cause to search vehicle); United States v. Hernandez, 976 F.2d 929, 930 (5th Cir. 1992) ("Once the dog alerted [officer] had probable cause to search the car"); United States v. Hill, 195 F.3d 258, 263 7 273 (6th Cir. 1999) (trained dog scratching and biting gave probable cause to search vehicle); United States v. Navarro-Camacho, 186 F.3d 701, 706  (6th Cir. 1999) ("A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance."); United States v. Diaz, 25 F.3d 392, (6th Cir. 1994) (probable cause to search car where dog that was trained to bite, bark, **and** scratch only scratched); United States v. Jones, 275 F.3d 648, 653 (7th Cir. 2001) (dog alert provided probable cause to search vehicle); United States v. Morgan, 270 F.3d 625, 628-29 (8th Cir. 2001) (trained dog biting and scratching at door provided probable cause to search vehicle); United States v. Munroe, 143 F.3d 1113, 1116 (8th Cir. 1998) (dog alert provided probable cause to search vehicle); United States v. Carrazco, 91 F.3d 65, 67 (8th Cir. 1966) (dog alert provides probable cause to search vehicle); United States v. Garcia, 205 F.3d 1182, (9th Cir. 2000) (certified drug dog's alert gave probable cause to search vehicle); United States v. Guerrero, 554 F.2d 987, 989 (9th Cir. 1977) (dog trained to alert to narcotics by scratching provided probable cause to search vehicle by "'alerting'" on back seat and bags in trunk); United States v. Robinson, 2001 WL 912859 at *7 (10th Cir. 2001) (trained dog's

"alert" to presence of narcotics established probable cause to search vehicle); United States v. Klinginsmith, 25 F.3d 1507, 1510 (10th Cir. 1994) (dog alert provided probable cause to search vehicle); United States v. Ludwig, 10 F.3d 1523, 1527 (10th Cir. 1993) ("We therefore have held in several cases that a dog alert without more gave probable cause for searches and seizures."); United States v. Chavira, 9 F.3d 888, 890 (10th Cir. 1993) ("When the dog indicated the presence of narcotics [in vehicle], [officer] had probable cause to conduct a search."); United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (dog sniff provided probable cause to search truck); United States v. Robinson, 2000 WL 970667 at *2 & 5 (D. Kan. June 26, 2000) (dog alert at tailgate provided probable cause to search vehicle); United States v. Neatherlin, 66 F.Supp.2d 1157, 1160 (D. Mon. 1999) ("a canine sniff alone supplies probable cause to search, provided that the dog is reliable."); United States v. One 1992 Isuzu Trooper, 51 F.Supp.2d 1268, 1271 (M.D. Ala. 1999) ("drug-sniffing dog then alerted on the car providing the officers with probable cause to search."); United States v. Nova-Nunez, 1997 WL 83289 at * 3 (S.D.N.Y. Feb. 16, 1997) (dog's alert for narcotics provided probable cause to search vehicle's trunk); United States v. Taylor, 955 F.Supp. 763, 769 (E.D. Mich. 1997) ("'alert' by a dog is sufficient to constitute probable cause for an arrest or search"); United States v. Hare, 932 F.Supp 843, 847 (E.D. Tex. 1996) (probable cause to search vehicle based on dog becoming "tense" and "scratching"); United States v. Kopp, 1994 WL 186034 (D. Kan. April 14, 1994) (dog alert to U-Haul trailer provided probable cause to search).  That the detectives here went the extra mile and obtained a warrant to search the car does not in any obviate the determination that they had probable cause to enter the car at the time the canine made his alert.

Having probable cause to believe that there were narcotics in defendant Berry's vehicle, the officers had the right to seize it and search it in its entirety. United States v. Ross, 456 U.S. 798, 825 (1982) (police may search every part of a vehicle and container within the vehicle that may conceal the object of the search if they have a generalized belief that the vehicle contains contraband somewhere inside); United States v. Harwood, 998 F.2d 91, 97 (2nd Cir. 1993) (warrantless search of door panels permissible as LSD in blotter form can be stashed anywhere in vehicle); United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 1996) (officer could forcibly remove secret compartment under back seat because he had probable cause to believe that car contained contraband); United States v. Zucco, 71 F.3d 188, 191-92 (5th Cir. 1995) (warrantless search of entire recreational vehicle including dismantling of vehicle wall permissible because probable cause to believe cocaine present); United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (warrantless search of locked trunk and engine compartment valid because officer had probable cause to search entire vehicle for drugs); United States v. Thornton, 197 F.3d 241, 247-49 (7th Cir. 1999) (warrantless search of hidden compartment in vehicle permissible where probable cause to search vehicle existed); United States v. Sample, 136 F.3d 562, 564 (8th Cir. 1997) (warrantless search of dashboard compartment valid because officer had probable cause to believe vehicle transporting contraband).

WHEREFORE, the government respectfully requests that the Court deny defendants' motions.

Respectfully submitted,
KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

_____
RACHEL CARLSON LIEBER
ASSISTANT UNITED STATES ATTORNEY
D.C. Bar No. 456-491
U.S. Attorney's Office
Organized Crime & Narcotics Trafficking Section
555 4th Street, N.W., Room 4820
Washington, DC 20530
(202) 353-8055   FAX:  (202) 514-8707

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was caused to be served upon Carlos Vanegas, attorney for Steven Berry, Thomas Saunders, attorney for Dominique Chappelle, and David Woll, attorney for Lamesha Owens, via electronic filing this 13th day of October, 2005.

_____
RACHEL CARLSON LIEBER
ASSISTANT UNITED STATES ATTORNEY